UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Darrell Williams and Cymonne Williams,

              Plaintiffs,          **MEMORANDUM OPINION
AND ORDER**
      v.                               Civil No. 10-2092 ADM/TNL

Sergeant David Voss, Sergeant Mark Sletta,
Officer Brandon Kitzerow,
Officer Mark Durand, Officer Shawn Williams,
Officer Jeff Kading, Officer Lonnie Hoffbeck,
Officer Peter Rud, Officer Kevin Angerhoffer,
Sergeant Brian Anderson, *in their official and
individual capacities,* and the City of Minneapolis,

              Defendants.

_____

Paul Applebaum, Esq., Applebaum Law Firm, and Sarah Henning, Esq., Attorney at Law, St. Paul, MN on behalf of Plaintiffs.

Sara J. Lathrop, Esq., Minneapolis City Attorney's Office, Minneapolis, MN, on behalf of Defendants.

_____

## I. INTRODUCTION

On July 21, 2011, the undersigned United States District Judge heard oral argument on Defendants' Motion for Summary Judgment [Docket No. 17] (the "Motion"). Plaintiffs Darrell Williams and Cymonne Williams (collectively, "the Williams") assert claims under 42 U.S.C. § 1983 as well as state common law claims of battery and assault stemming from the alleged use of excessive force in the execution of a search warrant by Defendants. For the reasons set forth below, Defendants' Motion is granted in part and denied in part.

## II. BACKGROUND[1]

Darrell Williams and Cymonne Williams are a married couple residing in Minneapolis, Minnesota. See Am. Compl. [Docket No. 12] ¶¶ 5-6. Tierre Caldwell ("Caldwell") is Cymonne Williams' son. Paul Applebaum Aff. [Docket No. 24] Ex. 1 ("C. Williams Dep.") 5:19-22. In May 2009, Caldwell was a suspect in a gang-related shooting in Minneapolis. Sara J. Lathrop Aff. [Docket No. 20] Ex. 1. The Minneapolis Police Department (the "MPD") assigned Defendant Sergeant David Voss ("Sgt. Voss") to investigate the case. See id. On May 19, 2009, Caldwell was detained and released during a vehicle stop by MPD officers. Id. Caldwell's driver's license listed his mother's address as his residence. See Applebaum Aff. Ex. 19 (Supplemental Report of Sgt. Voss). Based on Caldwell's driver's license address, Sgt. Voss obtained a search warrant for the Williams' home. Id.

Sgt. Voss's investigation had also revealed that Caldwell was listed as a customer by the electric company at a different address, ten blocks away also on 12th Avenue South in South Minneapolis. Id. Sgt. Voss obtained a search warrant for that address as well. Id. On July 9, 2009, at about 1:00 p.m., that warrant was executed by an MPD SWAT team. Id. A firearm and ammunition were discovered in the first search. Id.

The MPD SWAT team next proceeded to the Williams' home to execute the warrant for their home at about 1:45 p.m. Id. The parties strongly dispute what next occurred. Construing the facts in favor of the Williams, the SWAT team then entered the Williams' home without

---

[1] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

knocking and announcing their presence. Applebaum Aff. Ex. 3 ("J. Hedemark Dep.") 16:16-25. At the time, both of the Williams were upstairs with their family dog. C. Williams Dep. 17:16-24. Hearing a commotion downstairs, Cymonne Williams followed the dog down the stairs to investigate. C. Williams Dep. 18:3-13. Darrell Williams followed shortly behind. Applebaum Aff. Ex. 2 ("D. Williams Dep.") 27:12-18.

The dog reached the bottom of the stairs first. C. Williams Dep. 18:21-25. As Cymonne Williams was heading down the stairs, she saw a flash. C. Williams Dep. 18:25-19:1. The flash was SWAT team gunfire aimed at the family dog. Brandon Kitzerow Aff. [Docket No. 22] ¶ 4. Four rounds were fired at the dog, all four were recovered. Id. ¶ 5. The dog died at the scene. Am. Compl. ¶ 9.

Cymonne Williams then retreated up the stairs and past her husband, who was headed down the stairs. C. Williams Dep. 20:12-13. At the time, Darrell Williams was dressed only in his underwear. D. Williams Dep. 28:8-9. At the bottom of the stairs, he met the officers, who had their guns drawn and pointed at him. D. Williams Dep. 28:8-10, 32:24-25. Upon meeting the officers, Darrell Williams raised his hands above his head and said, "What the hell are you all doing in my house? What are you all here for?" D. Williams Dep. 30:20-24. The officers then told him, "Get down." D. Williams Dep. 30:24-25. Williams, however, did not comply. Instead, he repeated, with his hands still raised, "What are you here for?" D. Williams Dep. 30:25. An officer then struck Darrell Williams in the head with the butt of a rifle. See D. Williams Dep. 31:1-2; Appluebaum Aff. Ex. 17 ("D. Williams Aff.") ¶ 2. Around the time Williams fell to the ground, he was also kicked in the torso by an officer. D. Williams Dep.

3

34:16-35:60. An officer then placed his foot on Darrell Williams' head while other SWAT team members bound his hands. D. Williams Dep. 34:20-22. The SWAT team then proceeded upstairs and bound Cymonne Williams and her mother and brother who were also present, and searched the house. See C. Williams Dep. 23:14-24:23. No evidence was found. Applebaum Aff. Ex. 19.

After the search, Darrell Williams was taken to the hospital. See Applebaum Aff. Ex. 9 (medical record). He was diagnosed with a contusion of the eyelid and periocular area (i.e. the area of the eye socket), a rib contusion, and a headache. Applebaum Aff. Ex. 9 at MPLS 85. He was prescribed pain medication and instructed to apply ice or heat to the affected areas. Id. Following the incident, he missed a total of eight days of work. Lathrop Aff. Ex. 10. In November 2010, Caldwell was convicted of several state criminal offenses and sentenced to 110 months' imprisonment. Lathrop Aff. Ex. 11 at 1.

The Williams brought suit in state court in April 2010. In May 2010, Defendants removed this case to federal court. Defendants now move for summary judgment arguing that there is no genuine issue of material fact that unreasonable force was used, and regardless that Defendants are entitled to official immunity. In response to the Motion, the Williams voluntarily dismissed Sergeant Voss, Sergeant Anderson, Officer Williams, Officer Kading, Officer Hoffbeck, Officer Rud, and Officer Angerhoffer, leaving only Sergeant Sletta, Officer Kitzerow, Officer Durand, and the City of Minneapolis as Defendants.

## III.  DISCUSSION

A.  **Standard of Review**

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall issue "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing Fed. R. Civ. P. 56(c)); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) (same); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (same).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig, 54 F.3d at 470.  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

B.  **Section 1983 Standard**

The essential elements of a claim under 42 U.S.C. § 1983 are (1) whether the conduct complained of was committed by a person acting under the color of state law and (2) whether that conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.  DuBose v. Kelly, 187 F.3d 999, 1002 (8th Cir. 1999) (quoting Parratt v. Taylor, 451 U.S. 527, 535 (1981)).  The Fourth Amendment guarantees the right to be free from "unreasonable searches and seizures."  U.S. Const. amend IV.  The use of force by police officers on a person is a "seizure" under the Fourth Amendment, and thus excessive force claims are properly analyzed under an "objective reasonableness" standard.  Graham v. Connor, 490

U.S. 386, 388 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." Id. at 396 (quoting Tennesee v. Garner, 471 U.S. 1, 8 (1985)) (internal quotations omitted). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396 (citations omitted).

In addition, even if a defendant's conduct violated a constitutional right, the defendant may be entitled to "qualified immunity." A defendant is entitled to qualified immunity unless the right he is alleged to have violated is "clearly established" at the time of the violation. Saucier v. Katz, 533 U.S. 194, 202 (2001) (quotation omitted). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. (citation omitted).

**C.     State Law Claims**

In addition to asserting claims under § 1983, the Williams assert state law claims for assault and battery. Under Minnesota law, a battery is "an intentional unpermitted offensive contact with another." Paradise v. City of Minneapolis, 297 N.W.2d 152, 155 (Minn. 1980) (citation omitted). Under Minnesota law, an assault is "an unlawful threat to do bodily harm to another with the present ability to carry the threat into effect." Dahlin v. Fraser, 288 N.W. 851, 852 (Minn. 1939).

Similar to § 1983, police officers may be entitled to immunity on state law claims. In Minnesota, "official immunity" provides a public official with a defense to state law claims. Mumm v. Mornson, 708 N.W.2d 475, 490 (Minn. 2006). Official immunity protects discretionary conduct unless an official commits a "willful or malicious wrong." Elwood v. Rice County, 423 N.W.2d 671, 679 (Minn. 1988). A willful or malicious wrong is an act that an official "has reason to believe is prohibited." Rico v. State, 472 N.W.2d 100, 107 (Minn. 1991).

Several factual theories of recovery under both § 1983 and Minnesota state law have been argued, and each is considered below.

**D.      Claims Related to the Shooting of the Family Dog**

The Williams assert § 1983 claims premised on the shooting of the family dog, and the same shooting forms the basis of Cymonne Williams' assault claim. The precise § 1983 theory pursued by the Williams is disputed by the parties. The Williams appear to argue that the killing of a dog was both (1) an unreasonable seizure of the dog itself due to the failure to knock and announce by the police officers, and (2) an unreasonable seizure of Cymonne Williams. Defendants argue that the first theory was not properly pled and cannot now be pursued. Because Defendants are entitled to summary judgment on either theory, Defendants' pleading arguments need not be resolved.

       **1.      Seizure of the dog**

The Williams argue that it was unreasonable to shoot their dog because it posed no threat to officer safety, it was not behaving aggressively towards them, and even if it were behaving aggressively, the failure of the SWAT team to knock and announce caused the dog's behavior.

No genuine issue of material fact exists as to whether the dog acted aggressively towards the officers. Officers Kitzerow and Sgt. Sletta submitted sworn affidavits stating that the dog charged at them aggressively. Kitzerow Aff. ¶ 4; Mark Sletta Aff. [Docket No. 21] ¶ 9. During their depositions, both Williams testified that they could not see the dog at the time it was shot. C. Williams Dep. 20:2-6; D. Williams Dep. 38:11-13. Therefore, no genuine issue of material fact exists–the officers on the scene assert the dog aggressively charged at the officers and the Williams have no specific evidence to refute that assertion.

After her deposition, in conjunction with this Motion, Cymonne Williams submitted an affidavit stating that "it did not appear . . . that [the dog] was charging or behaving aggressively towards the officers" and that the dog did not reenter her field of vision, as it would have had to do to charge the officers. Applebaum Aff. Ex. 16 ("C. Williams Aff.") ¶ 2. This affidavit fails to raise a genuine issue of fact because it does not refute the testimony of the officers on the scene. Cymonne Williams states that she was at the bottom of the stairs and in a position to see the dog, but at her deposition testified that she was in the middle of the stairs. Compare C. Williams Aff. ¶ 2 (at bottom of stairs) with C. Williams Dep. 18:20 (at middle of stairs). At oral argument, Cymonne Williams' counsel explained this inconsistency by stating that the dog would have been visible to her even if she were in the middle of the stairs. Regardless, Cymonne Williams admits in both her deposition and affidavit that she did not see the dog at the time of the shooting. Furthermore, that Cymonne Williams believes the dog would have had to return to her line of sight to charge the officers is merely speculation or conjecture, and cannot defeat summary judgment. See Gregory v. City of Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992) (noting that party must submit more evidence than "mere speculation, conjecture, or fantasy" to

defeat summary judgment) (quotation omitted). The dog clearly could have begun charging the officers prior to returning to Cymonne Williams' field of vision, particularly because her field of vision from the stairs would have been limited by the structure of the house as shown in the pictures of the Williams' home. See Applebaum Aff. Ex. 14 (photograph showing enclosed staircase).

With the factual record clarified, the question becomes whether it was reasonable for the officers to shoot the dog as it aggressively charged toward them. The Williams argue that it was unreasonable to shoot the dog because any aggressiveness of the dog was caused by the SWAT team's failure to knock and announce their presence. The Williams explain that they are *not* alleging that the failure to knock and announce led to an unreasonable search which caused the dog's death, but rather only argue that the failure to knock and announce is part of the overall calculus of reasonableness. Pls.' Mem. of Law in Opp. to Defs.' Mot. for Summ. J. at 22. However, in evaluating reasonableness, courts must look to what was reasonable "at the moment" and allow for "split-second judgments." Graham, 490 U.S. at 396. At the time of the seizure, that is the shooting and killing of the dog, the SWAT team was in the process of executing a high-risk warrant and the charging dog posed a threat to their safety. The Williams and Defendants variously point to the age of the dog (seven months) and the breed (a pit bull terrier) to influence the reasonableness calculus. Lathrop Aff. Ex. 7. Those factors essentially mitigate each other–while the dog was relatively young, it weighed about fifty pounds and it is a typically large breed. Lathrop Aff. Ex. 7. The dog was large enough to jeopardize the safety of the officers in the chaotic moments of search entry. Therefore, weighing the governmental interests and the intrusion on the rights of the Williams as pet owners, the killing of the dog was

not unreasonable as a matter of law.

Furthermore, even if the failure to knock and announce created the need to shoot the dog, and therefore caused the seizure to be unreasonable, the officers are entitled to qualified immunity. Several courts have held that it is reasonable to shoot a dog that poses a risk to officer safety. See, e.g., Bailey v. Schmidt, 239 F. App'x 306, 308 (8th Cir. 2007) (holding that it was reasonable to kill pit bull terriers where dogs either advanced on officers or acted aggressively); Dziekan v. Gaynor, 376 F. Supp. 2d 267, 271-72 (D. Conn. 2005) (holding that it was not unreasonable to shoot fifty-five to sixty-pound dog that was advancing quickly on officer). Therefore, if that analysis is altered by a knock and announce violation, no case so holding has been cited, and it would not be clear to a reasonable officer on the scene that it had become unreasonable to seize the dog. The common denominator for all cases holding that officers may seize an aggressive dog, and those that hold that officers may not seize a non-threatening dog, is officer safety. E.g., Dziekan, 376 F. Supp. 2d at 271. In light of that principle, with a dog bearing down upon them, reasonable officers, regardless of an earlier constitutional violation, would have understood the use of force against the dog to be justified. Therefore, to the extent the shooting of the dog forms the basis of a § 1983 claim, Defendants are entitled to summary judgment.

### 2. Seizure of Cymonne Williams

Cymonne Williams argues she was unconstitutionally seized when the officers fired at the dog because she was in the line of fire. A seizure of a person occurs when a police officer "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." Terry v. Ohio, 392 U.S. 1, 20 n.16 (1968). A seizure must be an "intentional

acquisition" of physical control. <u>Brower v. County of Inyo</u>, 489 U.S. 593, 596 (1989).

Here, her claim fails because an objective person in her situation would not have understood the SWAT team to be firing *at her*. All evidence of record indicates that the officers' only motive was to shoot the dog charging at them, not cause Cymonne Williams to submit to their authority or otherwise be seized. Officer Kiterzow states that he did not see anyone in the line of fire, and could not have been aware of her presence in the staircase. <u>See</u> Kitzerow Aff. ¶ 5. Furthermore, Cymonne Williams' own testimony supports the conclusion that the officers were not aware of her presence on the stairs at the time of the gunfire. She testified that she saw a flash and then black figures. C. Williams Dep. 18:13-19:6. Notably, she could not see the actual gun, could not see the faces of officers, was not spoken to by any officers, and did not see the officers until after the shots. Therefore, without any objective manifestation of an intent to seize Cymonne Williams through shooting at the dog, no constitutional violation occurred.

Finally, Cymonne Williams argues that binding her hands was an unconstitutional seizure. Again, the parties dispute whether this claim was properly pled, nevertheless the Court declines to decide that issue because no constitutional violation occurred. Because the SWAT team had a valid search warrant for the Williams' house, they had "the limited authority to detain the occupants of the premises while a proper search is conducted." <u>Michigan v. Summers</u>, 452 U.S. 692, 705 (1981). Therefore, Defendants are entitled to summary judgment on Cymonne Williams' § 1983 claims.

**E.     Cymonne Williams' State Law Claims**

The shooting of the dog near Cymonne Williams also forms the basis of her assault claim. Defendants are entitled to official immunity on that state law claim. No evidence of

record suggests that the officers believed their actions in shooting at the dog to be prohibited. To the contrary, officers may shoot dogs that advance aggressively towards them. See, e.g., Bailey, 239 F. App'x at 308; Dziekan, 376 F. Supp. 2d at 271-72. The officers did so, and as noted above, no evidence suggests that they were aware of Cymonne Williams' presence on the stairs as they dispatched gunfire into the vicinity. Therefore, Defendants are entitled to summary judgment on Cymonne Williams' assault claim.

**F.    Darrell Williams' § 1983 Claims**

Darrell Williams argues that excessive force was used against him as he was detained. He cites three discrete acts by officers–striking him with a rifle, kicking him in the torso, and stepping on his head–as constituting excessive force. Each act is considered in turn.

**1.    Striking Darrell Williams with a Rifle**

Darrell Williams has identified Sgt. Sletta as the officer who struck him in the head with a rifle. Police officers have a high interest in securing the premises when executing a high-risk warrant. See Summers, 452 U.S. at 699-703 (noting the "substantial law enforcement interests" of preventing suspects from fleeing and minimizing risks to officers in executing a search warrant). This was a high-risk warrant, issued to search for evidence of a gang-related shooting and presenting the possibility of recovering firearms and ammunition. Officers were authorized to use force in securing the premises in executing such a warrant. See Muehler v. Mena, 544 U.S. 93, 98-99 (2005) (holding that officers may use reasonable force to effectuate detention of occupant of home being searched). The determination of what constitutes reasonable force takes into account, among other things, whether a person is actively resisting. Graham, 490 U.S. at 386.

Darrell Williams was passively, not actively, resisting, only questioning once "What are you here for?" after being told to get down. The amount of force that may be used when a person is passively, not actively, resisting is an open question. The Eighth Circuit has only stated that "somewhat more" force may be used against a person passively resisting. Wertish v. Krueger, 433 F.3d 1062, 1066-67 (8th Cir. 2006). Without any guidance as to what force may be used against someone passively resisting, other than that force may be used, no "clearly established" law would have caused a reasonable officer to believe that striking Williams in the head was unreasonable given the severity of the crime that was the subject of the search warrant and the officers' need to safely execute that warrant. Sgt. Sletta is entitled to qualified immunity, and the rifle strike may not be a grounds for an excessive force claim here.

### 2. Kicking of Torso

Darrell Williams testified that an officer kicked him in the torso either "while" he was on the ground after being hit in the head or while he "was on [his] way" to the ground. D. Williams Dep. 34:17-18, 35:3-6. Officer Durand later admitted to kicking Williams while he was on the ground. Lathrop Aff. Ex. 6 ("Durand Dep.") 29:11-15. Officer Durand claims that he kicked Darrell Williams because his hands were underneath his body, Durand Dep. 29:3-18; Darrell Williams states that his hands were above his head at all times, D. Williams Aff. ¶ 3. Construing the facts favorably to Williams, kicking an unarmed non-suspect who is lying on the ground with his hands above his head is unreasonable. See Cook v. City of Minneapolis, Civil No. 06-579, 2007 WL 1576122, at *6 (D. Minn. May 31, 2007) ("Even when executing a search warrant, it should be a rare case in which an officer must resort to kicking people . . . ."). Defendants, through counsel, argue that the kick was an attempt to ground Williams because the

13

kick "would have had" to come "at virtually the same time" as the strike to the head. Defs.' Mem. of Law in Supp. of Defs.' Mot. for Summ. J. at 18. This is attorney argument not evidence and cannot be the basis for a grant of summary judgment. See Delmarva Power & Light Co. v. United States, 79 Fed. Cl. 205, 217 (Fed. Cl. 2007) ("Attorney argument asserting a genuine issue of material fact is insufficient to oppose successfully a motion for summary judgment."). There is no evidence of record setting the interval of time between the strike to the head and the kick. There is also no evidence of record to suggest that the kick was for the purpose of grounding Williams–indeed Officer Durand testified that Darrell Williams was already on the ground when he kicked him. Durand Dep. 29:11-12. Therefore, construing all evidence in favor of Williams, as we must, this use of force against him was unreasonable.

Having found the use of force in kicking Williams' torso unreasonable, the inquiry shifts to qualified immunity. Defendants assert that Darrell Williams only suffered *de minimus* injuries, and as such Officer Durand is entitled to qualified immunity. No explicit standard or rule has been set forth for determining what qualifies as a *de minimus* injury. The Eighth Circuit most recently discussed *de minimus* injury in Chambers v. Pennycook, 641 F.3d 898 (8th Cir. 2011). In Chambers, the court ruled that a "back contusion" was only *de minimus* injury. Id. at 902, 908. However, the court drew a distinction between a back contusion and any "bruising or swelling on [the plaintiff's] spinal area." Id. at 902.

Defendants argue that Darrell Williams' rib contusion is a *de minimus* injury. In light of Chambers' distinction between soft tissue contusions and bone contusions, however, Williams' injury was not *de minimus*. A rib contusion is a bone contusion, is extremely painful, and required Darrell Williams to miss significantly more work than the plaintiffs in other *de minimus*

14

injury cases. Compare Herr v. Peterson, 751 F. Supp. 2d 1093, 1096 (D. Minn. 2010) (plaintiff missed two days of work) with Lathrop Aff. Ex. 10 (showing Darrell Williams missed eight total days of work, the last coming twelve days from the incident). As noted in Chambers, prior to June 2011, police officers using unreasonable force ran the risk of forfeiting qualified immunity if they caused more than *de minimus* injury. See 641 F.3d at 908 ("a reasonable officer could have believed that as long as he did not cause more than *de minimus* injury to an arrestee, his action would not run afoul of the Fourth Amendment."). As it turns out, Officer Durand's kicks caused more than *de minimus* injury, and he is not entitled to qualified immunity. Summary judgment, as it relates to the kick to Darrell Williams' torso, is denied.

### 3. Stepping on Williams' Head

Officers stepped on Darrell Williams' head as they bound him and searched his house. D. Williams Dep. 36:1-37:1. The record does not indicate that he suffered any injury from that act, other than possibly aggravating the injuries he sustained from the strike to his head. Therefore, qualified immunity applies and Defendants are entitled to summary judgment on that theory of the use of force. See Andrews v. Fuoss, 417 F.3d 813, 818-19 (8th Cir. 2005) (holding that slight aggravations of pre-existing conditions are *de minimus* injury); Chambers, 641 F.3d at 908 (holding that officers are entitled to qualified immunity for causing *de minimus* injury prior to June 2011).

### G. Darrell Williams' State Law Claims

Darrell Williams also asserts assault and battery claims against Defendants for their use of force. Because of their interest in securing the premises, and as discussed above as related to qualified immunity, Defendants are entitled to official immunity for their acts of striking

Williams over the head and stepping on his head. However, in light of the established law at the time, an officer on the scene would have had reason to believe kicking Darrell Williams in the torso once down and no longer resisting was prohibited. Without immunity, the evidence of record establishes prima facie cases of assault and battery. As such, summary judgment is denied as it relates to Darrell Williams' assault and battery claims insofar as it relates to the kick to his torso.

## IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion for Summary Judgment [Docket No. 17] is **GRANTED IN PART** and **DENIED IN PART**;

2. All claims asserted by Plaintiff Cymonne Williams are **DISMISSED WITH PREJUDICE**;

3. All claims against Defendants Sergeant Voss, Sergeant Anderson, Officer Williams, Officer Kading, Officer Offbeck, Officer Rud, and Officer Angerhoffer are **DISMISSED WITH PREJUDICE** pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure;

4. All claims against Defendants Sergeant Sletta and Officer Kitzerow are **DISMISSED WITH PREJUDICE**; and

5. The sole triable issue remaining is whether Officer Mark Durand and/or the City of Minneapolis are liable for Officer Durand's kick to Plaintiff Darrell Williams' torso under 43 U.S.C. § 1983 or under Minnesota common law for assault or battery.

Dated: September 15, 2011.

BY THE COURT:

    S/Ann D. Montgomery    
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE